**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
-----------------------------------------------------------------x

|  |  |
|---|---|
| ALL SMILESSS, LLC, | :    Civil Action No.: 1:22-cv-05489 |
|        Plaintiff, | :    (KMW-SAK) |
|  | : |
| v. | : |
|  | : |
| GIOVANNI GUSSEN, | : |
|  | : |
|        Defendant. | : |
|  | : |

-----------------------------------------------------------------x

## AFFIDAVIT OF WAHEED AHMADZAI
## IN SUPPORT OF ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| STATE OF MINNESOTA | ) |
| | ) ss.: |
| COUNTY OF HENNEPIN | ) |

WAHEED AHMADZAI, being duly sworn, deposes and says:

1.     I am over 18 years of age, of sound mind and otherwise competent to make this Affidavit. The evidence set out in the foregoing Affidavit is based on my personal knowledge.

2.     I am the sole owner and/or majority member of Plaintiff, All Smilesss, LLC ("Plaintiff" or the "Company"), and I submit this Affidavit in support of Plaintiff's Order to Show Cause for a Preliminary Injunction.

3.     I am requesting the Court to grant injunctive relief because, on Friday, September 9, 2022, Defendant misappropriated and embezzled over $618,000 from the Company along with other Company assets, including passwords to cryptocurrency wallets and other digital assets, such as social media accounts.

4.     This has had an immediate effect not only on the Company's ability to continue

Scanned with CamScanner

operations but is causing, and will continue to cause, the Company to lose goodwill and reputation in the Company's marketplace. Immediate relief is required.

**A.    My Background**

5.      I was born on January 20, 2000, in Kabul, Afghanistan.

6.      My father passed away of cancer when I was five years old. My mother raised me and my three older brothers and older sister by herself.

7.      Over time, my siblings emigrated from Afghanistan into safer countries, including the United States and Germany.

8.      In 2015, when I was fifteen years old, I obtained a student visa which permitted me to attend high school in the United States. I attended Cotter High School in Winona, Minnesota.

9.      In 2017, my mother joined me and my older brother in Minnesota.

10.     I graduated high school in 2019.

11.     After high school, I enrolled at Minnesota Community and Technical College in Minneapolis, MN to continue my education.

12.     During this time, I proudly became a permanent resident of the United States.

**B.    My Artistic Journey**

13.     Like many teenagers, I quickly adopted social media and created accounts on platforms such as Instagram, Twitter, and others.

14.     Hip-hop music resonated with me in a deep way, and I immersed himself in this music genre and culture.

15.     In or around 2019, I began making digital collages and artwork on my cell phone and sharing it with my friends and followers on various social media platforms.

16.     My artistic expression and craft reflected my love of hip-hop through the lens of an

Scanned with CamScanner

Afghan immigrant living in the United States.

17.     My work caught the eye of a famous rapper's manager, who reposted one of my creations on his Instagram account.

18.     My social media accounts flooded with followers and fans.

19.     My artwork became popular with major hip-hop artists, one of whom commissioned me to design his album cover. That album went to No. 1 on the music charts and my popularity surged.

20.     As a 21-year-old Afghan hip-hop fan and visual artist I felt blessed that my artwork resonated with my audience.

21.     My sole goal has been to spread a message of community and compassion through artwork and to support my mother and loving family.

**C.      I Meet the Defendant**

22.     At the suggestion of a friend, I began exploring the world of digital assets known as non-fungible tokens ("NFTs") as a way to share my work with my fans and followers.

23.     Eager to learn more about this new and quickly expanding space, I started using an app called Clubhouse to chat with other users about NFTs, digital art, and his other interests.

24.     In or around Spring 2021, I met Defendant through the Clubhouse app.

25.     Defendant represented himself to me as an expert in developing start-up companies in the digital space. He claimed to have extensive business experience.

26.     I understood that Defendant was a 26-year-old with a high school education. However, I believed Defendant when he told me about his extensive business experience.

27.     Defendant and I chatted frequently on Clubhouse and later by text message and telephone. We did not meet face to face until much later.

28.     I realize now that Defendant was grooming me with free advice and assistance on how to

Scanned with CamScanner

share my artwork with others using NFTs.

29.     Defendant convinced me that he was an experienced businessperson with my best interests at heart.

30.     I was impressed with Defendant's apparent knowledge of the NFT world and happy to have met someone I believed to be a friend and someone I could trust. In my eyes, he became like an older brother to me.

**D.     Defendant and I Reach an Agreement as to the Terms of our Relationship**

31.     In or around August 2021, Defendant offered to help me with forming and developing a business entity to market my work, to be named All Smilesss.

32.     In this discussion, Defendant promised me, among other things, that: 1) he would hire competent counsel to draft an operating agreement; 2) he would engage a competent accountant to handle the company's tax filings and related matters; 3) he would engage a competent marketing team to increase brand awareness; and 4) he would devote his full time and attention to, and use his best efforts in, managing the day-to-day operations of the company. In other words, Defendant promised me he would handle all aspects of the business so that I could concentrate on making art.

33.     In exchange for these promises, Defendant requested that the company employ him as Chief Executive Officer and remunerate him with a one-time payment of fifteen percent (15%) of the company's net profits from the company's initial project.

34.     Defendant and I further agreed that I, as creator and originator of the All Smilesss brand and all its intellectual property, would receive a one-time payment of thirty percent (30%) of the company's net profits from company's the initial project.

35.     We further agreed that All Smilesss' developer/coder – also called the "dev team" – would receive approximately 17.5% of the company's net profits from the company's initial project. The

Scanned with CamScanner

dev team would be responsible for converting the digital art into a digital asset on the blockchain – a process known as "minting."

36.     We also agreed that the company would retain the remaining percentage of the net profits from the company's initial project, i.e., 62.5%, to be used for operating expenses, including taxes.

37.     We were very clear as to these terms and what each of us would do. It was very clear to both of us that Defendant would handle the business side as an employee of the company and not an owner. All Smilesss was my idea based on my artwork, my popularity, and my audience.

38.     This agreement was our contract (the "Oral Agreement").

39.     We projected that the company's initial project could yield potentially millions of dollars, and each of us would be compensated fairly based on our profit-sharing percentages.

E.      **Defendant Procures My Signature on a Written Agreement Under False Pretenses**

40.     In or around September 25 or 26, 2021, Defendant forwarded me written operating agreement (the "Disputed Contract").

41.     Defendant told me that the Disputed Contract had been drafted by an attorney specializing in the NFT space.

42.     I later learned that the Disputed Contract was not drafted by an attorney, but rather an internet-based "legal advocate" who has publicly and, apparently, falsely, held herself out to be an attorney.

43.     I relied on this misrepresentation as it gave the Disputed Contract an air of authenticity.

44.     Defendant told me that the Disputed Contract accurately captured the material terms of the Oral Agreement, including that I would remain the 100% owner of All Smilesss and Defendant would be employed as Chief Executive Officer.

45.     I later realized that the Disputed Contract did not capture the material terms of the Oral

Scanned with CamScanner

Agreement at all.

46.   Defendant did not recommend that I have the Disputed Contract reviewed by an attorney.

47.   Defendant urged me to sign the Disputed Contract quickly so that the "attorney" could register the company.

48.   When I read the Disputed Contract, I noticed that Defendant had listed himself as the 49% owner of the new entity, not as an employee or, at best, a business advisor. I questioned Defendant about this.

49.   When asked about the percentages, Defendant told me that the 49% ownership did not relate to the profits of the business, but only to the management of the company. In other words, I would have the majority vote on management matters and thus retain decision making control. I had no understanding that Defendant would be entitled to half of the company's profits and future revenues. I never would have signed the Disputed Contract if Defendant hadn't lied to me about this.

50.   I trusted the Defendant and thought of him as an older brother. I realize now that I was naive to think Defendant had anything but his own selfish interests at heart.

51.   On September 27, 2021, I executed the Disputed Contract. A true copy of the Disputed Contract is attached to my affidavit as Exhibit A.

52.   At that point, Defendant and I had still not met face to face.

53.   On or about September 28, 2021, Plaintiff came into being as a Wyoming limited liability company.

**F.    Plaintiff Launches its First Project Successfully and Earns Substantial Revenue**

54.   For the next three months, I worked tirelessly to create my first collection of artworks to be minted as NFTs. This collection eventually grew to 8,888 individual pieces of art.

55.   I believe my work is innovative and exciting as it tells a visual story from the perspective

Scanned with CamScanner

of a "brown kid" living in a majority white society. My artwork is known for being three-dimensional (where most visual NFTs are two-dimensional) and rendered digitally in high quality.

56.     The Plaintiff released the NFTs were released to the public on November 3, 2022. To my great joy and pride, the collection immediately sold out, earning approximately $4,000,000 in revenue at the then-current cryptocurrency rates.

57.     Around this time Defendant and I met face to face for the first time.

58.     When revenue began pouring in, the Company made profit-sharing payments according to the Oral Agreement, not the Disputed Contract. I received approximately $1.1 million (roughly 30%) and Defendant received approximately $529,000 (roughly 15%). Defendant and I agreed to these profit-sharing payments. Defendant made no mention of "profit distributions" or that he was owed more than the 15% specified in the Oral Agreement.

**G.     Defendant Fails in His Role as Chief Executive Officer**

59.     Defendant received a windfall payment of roughly $529,000 only weeks after becoming CEO, before he had performed any substantive work.

60.     After receiving this windfall payment, Defendant failed to act in the best interests of Plaintiff and failed in his role as Chief Executive Officer.

61.     By way of example, and not of limitation, Defendant failed to hire a competent accountant to manage Plaintiff's taxes and related accounting matters. As of this date, Plaintiff has yet to file its 2021 or 2022 tax returns.

62.     As a further example, Defendant hired incompetent cronies as employees or consultants in marketing and other areas and paid them exorbitant fees or salaries with little to show for it. Defendant also hired unnecessary staff causing the Plaintiff to incur unnecessary expense.

63.     Defendant failed to use his best efforts and devote his time and attention to the Plaintiff.

Scanned with CamScanner

64. By way of example, and not of limitation, Plaintiff planned a large live event in New York City to support the All Smilesss brand. The crony "marketing advisor" hired by Defendant failed to plan the event according to the agreed-upon timetable, causing me to have to scramble to organize the event myself in a matter of days, incurring significant extra expense in doing so. Defendant offered no assistance whatsoever although it was his area of responsibility.

65. Defendant failed to execute his responsibilities as CEO when it came to running the day-to-day operations of the company.

66. Defendant received over a half million dollars for essentially providing occasional business advice and making a mess of the Company's financial and legal obligations. He did not fulfill his end of the bargain.

**H.     Plaintiff Terminates Defendant's Employment**

67. Over the next few months, I began to realize that Defendant was not the experienced businessperson he had represented himself to be, was not a friend or brother, and was not acting in my or the Company's best interests. I came to understand that I had been taken advantage of by an internet charlatan.

68. I brought my concerns about Defendant's qualifications and conduct to Defendant's attention in or around August 2022.

69. After discussion, I informed Defendant that his services were no longer required, but that I would treat Defendant fairly in letting him go.

70. Defendant told me that he needed more money because he was living at home and working in his father's restaurant.

71. I offered to give Defendant $150,000 to $200,000 as severance pay in exchange for his separation from the company. This amount was intended to cover Defendant's tax liability on his profit

Scanned with CamScanner

share.

72.     A short while later, however, Defendant countered with unrealistic demands. He now wanted approximately $618,000 plus $2,000,000 over 24 months. Defendant claimed he was due this money because of his 49% ownership of Plaintiff.

73.     This was the first time in our relationship where Defendant ever stated or implied that he had a right to an ownership distribution.

74.     I was completely shocked. I told Defendant, on behalf of Plaintiff, that this made no sense and was impossible. I never intended to give away half my company's profits and future revenues to Defendant, and he knew this.

75.     On August 31, 2022, Defendant demanded approximately $618,000, plus $1 million, plus 15% of the company's future assets and licensing. I again told Defendant no.

**I.      Defendant Embezzles Over $618,000 in Company Funds**

76.     In early September 2022, I requested administrative access to Plaintiff's bank account and passwords to Plaintiff's cryptocurrency wallets. I also requested the passwords to the Company's social media accounts. Defendant refused to provide this information.

77.     On September 8, 2022, I directed the Company's attorneys to contact Defendant to request that Defendant stop communicating with me directly.

78.     On Friday, September 9, 2022, Defendant withdrew over $618,000 from Plaintiff's operating account. He did so unilaterally, without notice to or authorization from me or the Company.

79.     The whereabouts of these funds is presently unknown.

80.     Defendant is refusing to return these funds and appears to be holding them hostage to gain some advantage in the negotiations which he thinks will take place.

81.     The All Smilesss community, consisting of my fans, followers, and collectors of my art,

Scanned with CamScanner

have expressed, in online forums and personal communications, that they are aware there is something going on between Defendant and me. They appear to be concerned that their NFTs will lose resale value or the Company will go out of business if this issue is not resolved soon.

82.    The Company has no access to its cryptocurrency wallets – Defendant has the only passwords. If these passwords are lost, stolen or destroyed, the funds in there will be almost impossible to retrieve.

83.    The Company has no access to its social media accounts – Defendant has the access information and is refusing to return it.

84.    The Company is suffering because of Defendant's actions.

Waheed Ahmadzai

Sworn to before me this 12th
day of September, 2022
Rhoneisha Williams
[NAME]
Notary Public

RHONEISHA D WILLIAMS
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2027

Scanned with CamScanner

# EXHIBIT A

# ALL SMILESSS, LLC
# OPERATING AGREEMENT

This Operating Agreement (the "Agreement") is made effective as of the date of filling with the Wyoming Secretary of State, by Waheed Ahmadzai and Giovanni Gussen, (the "Members").

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

## ARTICLE I
## ORGANIZATION

1.1 *Formation*: The Members hereby organize a limited liability company (the "Company") pursuant to the provisions under the Wyoming Statutes (Title 17, Chapter 25 - 109) (the "Act") by filing Articles of Organization with the Wyoming Secretary of State.

1.2 *Effective Date*: The Company shall come into being on, and this Agreement shall take effect from the date the Certificate of Formation of the Company is filed with the Secretary of State in the state of organization or charter. This agreement supersedes all other agreements written or oral.

1.3 *Name:* The name of the Company shall be "All Smilesss, LLC." The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Members deem appropriate or advisable. The Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Members consider appropriate or advisable.

1.4 *Term:* The term of the Company commenced on the filing of the Articles of Organization and shall be perpetual unless dissolved as provided in this Agreement.

1.5 *Office and Agent:* The principal office of the Company shall be at such place or places of business within or outside the State of Wyoming as the Members may determine. The Company shall continuously maintain a registered agent in the State of Wyoming as required by the Act. The registered agent shall be as stated in the Articles of Organization or as otherwise determined by the Members. The registered office and agent may be changed from time to time as the members may see fit, by filing a change of registered agent or office form with the state LLC filing office. It will not be necessary to amend this provision of the operating agreement if and when such a change is made.

1.6 *Business Purpose:* The purpose of the Company is to engage in the business of developing, marketing and monetizing creative and media-related projects, some of which shall be written to or read from a blockchain. It is understood that the foregoing statement of purposes shall not serve as a limitation on the powers or abilities of this LLC, which shall be permitted to engage in any and all lawful business activities. If this LLC intends to engage in business activities outside the state of its formation that require the qualification of the LLC in other states, it shall obtain such qualification before engaging in such out-of-state activities.

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

## ARTICLE II
## MEMBERSHIP PROVISIONS

2.1 *Non-liability of Members:* No member of this LLC shall be personally liable for the expenses, debts, obligations or liabilities of the LLC, or for claims made against it..

2.2 *Reimbursement for Organizational Costs:* Members shall be reimbursed by the LLC for organizational expenses paid by the members. The LLC shall be authorized to elect to deduct organizational expenses and start-up expenditures ratably over a period of time as permitted by the Internal Revenue Code and as may be advised by the LLC's tax advisor.

2.3 *Management:* This LLC shall be managed exclusively by all of its members.

2.4  *Members' Percentage Interests:* A member's percentage interest in this LLC shall be computed as a fraction, the numerator of which is the total of a member's capital account and the denominator of which is the total of all capital accounts of all members. This fraction shall be expressed in this agreement as a percentage, which shall be called each member's "percentage interest" in this LLC.

2.5 *Membership Voting:* Except as otherwise may be required by the Articles of Organization, Certificate of Formation or a similar organizational document, other provisions of this operating agreement, or under the laws of this state, each member shall vote on any matter submitted to the membership for approval in proportion to the member's percentage interest in this LLC. Further, unless defined otherwise for a particular provision of this operating agreement, the phrase "majority of members" means the vote of members whose combined votes equal more than 50% of the votes of all members in this LLC.

2.6 *Compensation:* Members may be paid as members of the LLC for performing any duties associated with such membership, including management of the LLC. Members may also be paid for any services rendered in any other capacity for the LLC, whether as officers, employees, independent contractors or otherwise.

2.7 *Members' Meetings:* The LLC shall not provide for regular members' meetings. However, any member may call a meeting by communicating his or her wish to schedule a meeting to all other members. Such notification may be in person or in writing, or by telephone, facsimile machine, or other form of electronic communication reasonably expected to be received by a member, and the other members shall then agree, either personally, in writing, or by telephone, facsimile machine or other form of electronic communication to the member calling the meeting, to meet at a mutually acceptable time and place. Notice of the business to be transacted at the meeting need not be given to members by the member calling the meeting, and any business may be discussed and conducted at the meeting. If all members cannot attend a meeting, it shall be postponed to a date and time when all members can attend, unless all members who do not attend have agreed in writing to the holding of the meeting without them. If a meeting is postponed, and the postponed meeting cannot be held either because all members do not attend the postponed meeting or the non-attending members have not signed a written consent to allow the postponed meeting to be held without them, a second postponed meeting may be held at a date and time announced at the first postponed meeting. The date and

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

time of the second postponed meeting shall also be communicated to any members not attending the first postponed meeting. The second postponed meeting may be held without the attendance of all members as long as a majority of the percentage interests of the membership of this LLC is in attendance at the second postponed meeting. Written notice of the decisions or approvals made at this second postponed meeting shall be mailed or delivered to each non-attending member promptly after the holding of the second postponed meeting. Written minutes of the discussions and proposals presented at a members' meeting, and the votes taken and matters approved at such meeting, shall be taken by one of the members or a person designated at the meeting. A copy of the minutes of the meeting shall be placed in the LLC's records book after the meeting.

2.8 *Membership Certificates:* This LLC shall be authorized to obtain and issue certificates representing or certifying membership interests in this LLC. Each certificate shall show the name of the LLC, the name of the member, and state that the person named is a member of the LLC and is entitled to all the rights granted members of the LLC under the Articles of Organization, Certificate of Formation or a similar organizational document, this operating agreement and provisions of law. Each membership certificate shall be consecutively numbered and signed by one or more officers of this LLC. The certificates shall include any additional information considered appropriate for inclusion by the members on membership certificates. In addition to the above information, all membership certificates shall bear a prominent legend on their face or reverse side stating, summarizing or referring to any transfer restrictions that apply to memberships in this LLC under the Articles of Organization, Certificate of Formation or a similar organizational document and/or this operating agreement, and the address where a member may obtain a copy of these restrictions upon request from this LLC.  The records book of this LLC shall contain a list of the names and addresses of all persons to whom certificates have been issued, show the date of issuance of each certificate, and record the date of all cancellations or transfers of membership certificates.

### ARTICLE III
### TAX AND FINANCIAL PROVISIONS

3.1 *Tax Classification* of *LLC:* The members of this LLC intend that this LLC be initially classified as a partnership for federal and, if applicable, state income tax purposes.  It is understood that all members may agree to change the tax treatment of this LLC by signing, or authorizing the signature of, IRS Form 8832, Entity Classification Election, and filing it with the IRS and, if applicable, the state tax department within the prescribed time limits.

3.2 *Tax Year and Accounting Method:* The tax year of this LLC shall be 2021. The LLC shall use the cash basis method of accounting. Both the tax year and the accounting period of the LLC may be changed with the consent of all members if the LLC qualifies for such change, and may be affected by the filing of appropriate forms with the IRS and state tax authorities.

3.3 *Tax Matters Partner:* The Managing Members will designate a Certified Public Accountant (CPA) as the "partnership representative" of the LLC for purposes of Section 6223 of the Code and the Treasury Regulations promulgated thereunder (the "Partnership Representative"), and all federal, state and local Tax audits and litigation shall be conducted under the direction of the CPA. The CPA shall use reasonable efforts

to inform each Managing Member of all significant matters that may come to its attention in its capacity as a Partnership Representative by giving Notice thereof and to forward to each Managing Member copies of all significant written communications it may receive in such capacity.

3.4  *Annual Income Tax Returns and Reports:* Within 60 days after the end of each tax year of the LLC, a copy of the LLC's state and federal income tax returns for the preceding tax year shall be mailed or otherwise provided to each member of the LLC, together with any additional information and forms necessary for each member to complete his or her individual state and federal income tax returns. If this LLC is classified as a partnership for income tax purposes, this additional information shall include a federal (and, if applicable, state) Form K-1 (Form 1065 - Partner's Share of Income, Credits, Deductions) or equivalent income tax reporting form. This additional information shall also include a financial report, which shall include a balance sheet and profit and loss statement for the prior tax year of the LLC.

3.5 *Bank Accounts:* The LLC shall designate one or more banks or other institutions for the deposit of the funds of the LLC, and shall establish savings, checking, investment and other such accounts as are reasonable and necessary for its business and investments.  One or more members of the LLC shall be designated with the consent of all members to deposit and withdraw funds of the LLC, and to direct the investment of funds from, into and among such accounts. The funds of the LLC, however and wherever deposited or invested, shall not be commingled with the personal funds of any members of the LLC.

3.6 *Title to Assets:* All personal and real property of this LLC shall be held in the name of the LLC, not in the names of individual members.

**ARTICLE IV**
**CAPITAL PROVISIONS**

4.1 *Capital Contributions by Members:* Members shall make the following contributions of cash, property or services as shown next to each member's name below. Unless otherwise noted, cash and property described below shall be paid or delivered to the LLC on or by two weeks from date of formation. The fair market values of items of property or services as agreed between the LLC and the contributing members are also shown below. The percentage interest in the LLC that each member shall receive in return for his or her capital contribution is also indicated for each member.

| NAME & ADDRESS | CONTRIBUTION | % INTEREST IN LLC |
|---|---|---|
| (1)  Waheed Ahmadzai<br>300 Penn Ave North<br>Minneapolis, MN 55404<br>612-281-7217 | $51.00 USD | 51 % |
| (2)  Giovanni Gussen<br>161 N. Main St.<br>Mullica Hill, NJ 08062 | $49.00 USD | 49 % |

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

609-617-4253

**4.2**  *Additional Contributions by Members:* The members may agree, from time to time by unanimous vote, to require the payment of additional capital contributions by the members, on or by a mutually agreeable date.

**4.3** *Failure to Make Contributions:* If a member fails to make a required capital contribution within the time agreed for a member's contribution, the remaining members may, by unanimous vote, agree to reschedule the time for payment of the capital contribution by the late-paying member, setting any additional repayment terms, such as a late payment penalty, rate of interest to be applied to the unpaid balance, or other monetary amount to be paid by the delinquent member, as the remaining members decide. Alternatively, the remaining members may, by unanimous vote, agree to cancel the membership of the delinquent member, provided any prior partial payments of capital made by the delinquent member are refunded promptly by the LLC to the member after the decision is made to terminate the membership of the delinquent member.

**4.4** *No Interest on Capital Contributions:* No interest shall be paid on funds or property contributed as capital to this LLC, or on funds reflected in the capital accounts of the members.

**4.5** *Capital Account Bookkeeping:* A capital account shall be set up and maintained on the books of the LLC for each member. It shall reflect each member's capital contribution to the LLC, increased by each member's share of profits in the LLC, decreased by each member's share of losses and expenses of the LLC, and adjusted as required in accordance with applicable provisions of the Internal Revenue Code and corresponding income tax regulations.

**4.6** *Consent to Capital Contribution Withdrawals and Distributions:* Members shall not be allowed to withdraw any part of their capital contributions or to receive distributions, whether in property or cash, except as otherwise allowed by this agreement and, in any case, only if such withdrawal is made with the written consent of all members.

**4.7** *Allocations of Profits and Losses:* No member shall be given priority or preference with respect to other members in obtaining a return of capital contributions, distributions or allocations of the income, gains, losses, deductions, credits or other items of the LLC.  The profits and losses of the LLC, and all items of its income, gain, loss, deduction and credit shall be allocated to members according to each member's percentage interest in this LLC.

**4.8** *Allocation and Distribution of Cash to Members:* Cash from LLC business operations, as well as cash from a sale or other disposition of LLC capital assets, may be distributed from time to time to members in accordance with each member's percentage interest in the LLC, as may be decided by the members.

**4.9** *Allocation of Non-cash Distributions:* If proceeds consist of property other than cash, the members shall decide the value of the property and allocate such value among the members in accordance with each member's percentage interest in the LLC.  If such non-cash proceeds are later reduced to cash, such cash may be distributed among the members as otherwise provided in this agreement.

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

4.10 *Allocation and Distribution of Liquidation Proceeds:* Regardless of any other provision in this agreement, if there is a distribution in liquidation of this LLC, or when any member's interest is liquidated, all items of income and loss shall be allocated to the members' capital accounts, and all appropriate credits and deductions shall then be made to these capital accounts before any final distribution is made. A final distribution shall be made to members only to the extent of, and in proportion to, any positive balance in each member's capital account.

## ARTICLE V
## MEMBERSHIP WITHDRAWAL AND TRANSFER PROVISIONS

5.1 *Withdrawal of Members:* A member may withdraw from this LLC by giving written notice to all other members at least 45 days before the date the withdrawal is to be effective.

5.2 *Restrictions* on *the Transfer of Membership:* A member shall not transfer his or her membership in the LLC unless all non-transferring members in the LLC first agree to approve the admission of the transferee into this LLC. Further, no member may encumber a part or all of his or her membership in the LLC by mortgage, pledge, granting of a security interest, lien or otherwise, unless the encumbrance has first been approved in writing by all other members of the LLC.  Notwithstanding the above provision, any member shall be allowed to assign an economic interest in his or her membership to another person without the approval of the other members. Such an assignment shall not include a transfer of the member's voting or management rights in this LLC, and the assignee shall not become a member of the LLC.

## ARTICLE VI
## DISSOLUTION PROVISIONS

6.1 *Events That Trigger Dissolution* of *the LLC:* The following events shall trigger dissolution of the LLC, except as provided:

(a) the death, permanent incapacity, bankruptcy, retirement, resignation or expulsion of a member, except that within 14 days of the happening of any of these events, all remaining members of the LLC may vote to continue the legal existence of the LLC, in which case the LLC shall not dissolve;

(b) the expiration of the term of existence of the LLC if such term is specified in the Articles of Organization, Certificate of Formation or a similar organizational document, or this operating agreement;

(c) the written agreement of all members to dissolve the LLC;

(d) entry of a decree of dissolution of the LLC under state law.

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

## ARTICLE VII
## GENERAL PROVISIONS

7.1 *Officers:* The LLC may designate one or more officers, such as a President, Vice President, Secretary and Treasurer. Persons who fill these positions need not be members of the LLC. Such positions may be compensated or non-compensated according to the nature and extent of the services rendered for the LLC as a part of the duties of each office. Ministerial services only as a part of any officer position will normally not be compensated, such as the
performance of officer duties specified in this agreement, but any officer may be reimbursed by the LLC for out-of-pocket expenses paid by the officer in carrying out the duties of his or her office.

7.2 *Records:* The LLC shall keep at its principal business address a copy of all proceedings of membership meetings, as well as books of account of the LLC's financial transactions. A list of the names and addresses of the current membership of the LLC also shall be maintained at this address, with notations on any transfers of members' interests to nonmembers or persons being admitted into membership in the LLC.

Copies of the LLC's Articles of Organization, Certificate of Formation or a similar organizational document, a signed copy of this operating agreement, and the LLC's tax returns for the preceding three tax years shall be kept at the principal business address of the LLC. A statement also shall be kept at this address containing any of the following information that is applicable to this LLC:

- the amount of cash or a description and value of property contributed or agreed to be contributed as capital to the LLC by each member;
- schedule showing when additional capital contributions are to be made by members to this LLC;
- a statement or schedule, if appropriate, showing the rights of members to receive distributions representing a return of part or all of members' capital contributions; and
- a description of, or date when, the legal existence of the LLC will terminate under provisions in the LLC's Articles of Organization, Certificate of Formation or a similar organizational document, or this operating agreement.

If one or more of the above items is included or listed in this operating agreement, it will be sufficient to keep a copy of this agreement at the principal business address of the LLC without having to prepare and keep a separate record of such item or items at this address.  Any member may inspect any and all records maintained by the LLC upon reasonable notice to the LLC. Copying of the LLC's records by members is allowed, but copying costs shall be paid for by the requesting member.

7.3 *All Necessary Acts:* The members and officers of this LLC are authorized to perform all acts necessary to perfect the organization of this LLC and to carry out its business operations expeditiously and efficiently. The Secretary of the LLC, or other officers, or all members of the LLC, may certify to other businesses, financial institutions and individuals as to the authority of one or more members or officers of this LLC to transact specific items of business on behalf of the LLC.

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

7.4 *Indemnification:*  The LLC shall indemnify the Member and those authorized officers, agents, and employees of the LLC identified in writing by the Member as entitled to being indemnified under this section for all costs, losses, liabilities and damages paid or accrued by the Member (as the Member or officer, agent, or employee) or any such office, agent, or employee in connection with the business of the LLC, except to the extent prohibited by the laws of the state that governs this Agreement.  In addition, the LLC may advance costs of defense of any proceeding to the Member or any such officer, agent, or employee upon receipt by the LLC of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined that the person is not entitled to be indemnified by the LLC.

7.5 *Mediation and Arbitration* of *Disputes Among Members:*  In any dispute over the provisions of this operating agreement and in other disputes among the members, if the members cannot resolve the dispute to their mutual satisfaction, the matter shall be submitted to mediation. The terms and procedure for mediation shall be arranged by the parties to the dispute. If good-faith mediation of a dispute proves impossible or if an agreed-upon mediation outcome cannot be obtained by the members who are parties to the dispute, the dispute may be submitted to arbitration in accordance with the rules of the American Arbitration Association. Any party may commence arbitration of the dispute by sending a written request for arbitration to all other parties to the dispute. The request shall state the nature of the dispute to be resolved by arbitration, and, if all parties to the dispute agree to arbitration, arbitration shall be commenced as soon as practical after such parties receive a copy of the written request.  All parties shall initially share the cost of arbitration, but the prevailing party or parties may be awarded attorney fees, costs and other expenses of arbitration. All arbitration decisions shall be final, binding and conclusive on all the parties to arbitration, and legal judgment may be entered based upon such decision in accordance with applicable law in any court having jurisdiction to do so.

7.6 *Governing Law*: This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Wyoming, including the Wyoming Statutes (Title 17, Chapter 25 - 109), (the "Act") as amended from time to time. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that a provision of this Agreement is inconsistent with any provision of the Act, the Agreement shall govern to the extent permitted by the Act.

7.7 *Entire Agreement:*  This operating agreement represents the entire agreement among the members of this LLC, and it shall not be amended, modified or replaced except by a written instrument executed by all the parties to this agreement who are current members of this LLC as well as any and all additional parties who became members of this LLC after the adoption of this agreement. This agreement replaces and supersedes all prior written and oral agreements among any and all members of this LLC.

7.8 *Severability:*  If any provision of this agreement is determined by a court or arbitrator to be invalid, unenforceable or otherwise ineffective, that provision shall be severed from the rest of this agreement, and the remaining provisions shall remain in effect and enforceable.

**ARTICLE VIII**

Document Ref: 7XHB5-M5BPO-MSJNY-EKGZN

## SIGNATURES OF MEMBERS

*Execution of Agreement: In* witness whereof, the members of this LLC sign and adopt this agreement as the operating agreement of this LLC.

Date:               2021-09-27
_____

Signature:          *Waheed Ahmadzai*
_____

Printed Name:   WAHEED AHMADZAI, Member


Date:               2021-09-27
_____

Signature:          *Giovanni Gussen*
_____

Printed Name:   GIOVANNI GUSSEN, Member

All Smilesss, LLC. Operating Agreement                    9

# Signature Certificate

Document Ref.: 7XHB5-M5BPO-MSJNY-EKGZN

Document signed by:



### Giovanni Gussen

Verified E-mail:
giovanni@smilesss.com



IP: 76.117.107.230     Date: 27 Sep 2021 22:47:06 UTC



### Waheed Ahmadzai

Verified E-mail:
waheed@smilesss.com



IP: 73.164.95.80     Date: 28 Sep 2021 02:46:34 UTC

Document completed by all parties on:
28 Sep 2021 02:46:34 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is a document workflow and certified eSignature
solution trusted by 25,000+ companies worldwide.

